# J. S. Allam v. Pennsylvania Railroad Company, Appellant.

*Common carrier—Presumption of negligence.*

Where goods are injured while in the custody of the carrier under a special contract, and he gives no account of how it occurred, a presumption of negligence follows of course: Express Co. v. Sands, 55 Pa. 140.

*Special custom in relief of carrier—Requisite proof.*

In all cases where relief of a carrier's liability at common law, by special custom or usage is relied on, such custom or usage must be clearly proved, and that the employer knew it, or is presumed to know it by reason of its generality in the neighborhood.

*Stipulation limiting carrier's liability—Public policy.*

Stipulations, insisted upon by carriers or other persons who stand in such a position toward their customers as enables them to compel a compliance with their demands or destroy their customer's business, will be judged of by their fairness, and held to be void whenever they are unreasonable or oppressive: Willock v. R. R. Co., 166 Pa. 184.

This principle applies alike to a custom and to a stipulation. Public policy compels its acceptance in all civilized countries.

*Carriers—Release from negligence—Public policy.*

Public policy forbids that any custom, stipulation or condition shall release the carrier from liability for negligence. Even a provision fixing the value of the property, or limiting the amount to be recovered, will not relieve the carrier if the loss or injury be due to negligence.

*Transition from carrier's to warehouseman's liability.*

When goods have been carried to place of destination, liability as carrier ceases, and the less onerous liability of warehouseman is substituted. This liability is only for negligence, measured by want of ordinary care.

*Railroads—Carrier's duty as to freight when landed.*

For a carrier to discharge freight without any attempt at making reasonable provision for its protection from dangers which, in the ordinary course of affairs, may naturally be apprehended, must be regarded as not only negligence but gross negligence.

The carrier's duty is not measured by the quantity of freight discharged; its duty is not discharged at any station, by dropping freight at the side of the road, whether on an open platform or in mud or snow, to remain exposed to the elements, to injury from other sources, or to theft, until the owner learns of its arrival and removes it. To give such a practice the legal sanction of a custom, or to enforce a stipulation permitting it, would be to place the public at the mercy of the carrier.

Argued Oct. 6, 1896. Appeal, No. 21, Nov. T., 1896, by defendant, from judgment of C. P. No. 4, Phila. Co., March T., 1894, No. 1329, on verdict for plaintiff. Before RICE, P. J., WILLARD, WICKHAM, BEAVER, REEDER, ORLADY and SMITH, JJ. Affirmed.

BEAVER, J., dissents. RICE, P. J. and WILLARD, J. concur in the dissent.

Assumpsit for lumber damaged in transit. Before THAYER, P. J.

The action was to recover $627 damages to lumber shipped by plaintiff to Strafford station, which, it was alleged, was found lying beside the railroad at Strafford station in a damaged condition. The goods were delivered in two carloads. Strafford station is what is known as a prepaid freight station,—that is, a freight station at which there is no freight agent or warehouse. Upon shipments made to such stations all freight must be collected in advance. The two bills of lading in this case were issued by railways connected with the Pennsylvania Railroad, the freight charges were prepaid, and the freight was delivered to the defendant at the point of connection of the two railways. The bill of lading for the first carload contained the following condition:

"Property destined to or taken from a station at which there is no regularly appointed agent, shall be entirely at risk of owner when unloaded from cars or until loaded in cars; and when received from or delivered on private or other sidings shall be at owner's risk until the cars are attached to and after they are detached from trains."

The bill of lading for the second carload contained the following condition:

"The carriage of said merchandise shall be complete and freight charges earned when it has been held a reasonable time, say twelve working hours, subject to the owner's order at the station or place where it is above agreed to be delivered, and if not then removed by the person or party entitled to receive the same, it may be removed and stored, or kept in the car, station, or place of delivery of the carrier, or otherwise, at the sole risk and further expense of such person or party without notice, ex-

cept that when merchandise is destined to or from the several 'way stations' and platforms where station buildings have not been established by the carrier, or where there are no regularly-appointed freight agents, it shall be at the risk of the owner until loaded into the cars, and when unloaded therefrom, and when received from or delivered on private turnouts it shall be at the owner's risk until cars are attached to and after they are detached from the trains."

There were questions in the case which sent it to the jury, there being a conflict of evidence as to whether or not the defendant's servants, who had the goods in charge on the train, had carefully unloaded them. The defendant offered evidence as to a custom upon all railroads to establish a prepaid freight station at which there is no freight agent or warehouse; that a prepaid station means such station where there is no freight agent or warehouse, and that it is the custom at such stations, as is set out in the bills of lading, to discharge the carriers from all responsibility as to the goods carried after their arrival at the station, and that they are at the risk of the owner after delivery at the station.

Other facts appear in the opinion of the Superior Court.

Verdict for plaintiff for $692. Defendant appealed.

A motion for a new trial was refused by THAYER, P. J., in an opinion reported in 5th Dist. Reports, 54.

*Errors assigned* were, (1) in charging the jury: "With regard to that part of the case I feel bound to say that it was the duty of the railroad company to notify the consignee of the arrival of the goods. Whether it was a prepaid station or not, in my opinion, they cannot lawfully divest themselves of that responsibility. It is the duty of the carrier always to give notice of the arrival of freight to the consignee."

(2) In charging the jury: "In those solitary country stations any person employed there to look after the railroad property —the station, the tracks, etc.—might easily be employed for such a purpose, but it is not the law, as I understand it, that any carrier can disembark goods from a ship or from cars and put them away to take their chance without saying anything to anybody, and without giving notice to anybody of their arrival. The whole mercantile community would be at the mercy of the

carrier if the law was such as it has been argued to be upon that subject by the learned counsel who represents the defendant."

(3) In charging the jury: " It is the habit, as we all know, of these carrying companies to incumber their bills of lading with a great variety of printed conditions, which are usually to be found in very small type on the backs of the bills of lading, and it is said here that some of those conditions relieve the defendants from giving notice. I do not find any such article or condition in any of these bills of lading, or anything which ·expressly exempts them from giving notice. There is a para- ·graph in one of them which says that the goods at such stations shall, when unloaded, be at the risk of the consignee. To make short work of that, all such conditions in bills of lading as are legal and as do not contravene the rights of individuals are binding, and all others are void."

(4) In refusing to affirm defendant's first point, and the answer thereto, as follows :

" The defendant in his first point has requested me to say to you that 'the defendant is entitled to the benefit of all the provisions and terms of the bill of lading issued by the companies to which these goods were delivered.' That is true. The company which received the goods from the New Jersey company —that is, the defendant in this case—has the right to the benefit of all the conditions and provisions of the contract which the plaintiff made with that company; that is, the Pennsylvania Railroad can claim the benefit of all the provisions of the contract which the plaintiff made with the New Jersey company, which was the company that first received the goods from the plaintiff. So far as that goes, I affirm the point made by the defendant.

" But the point goes on to say : 'And under the fifth and thirteenth clauses of the respective bills of lading of October 7, 1893, and February 22, 1894, the shipment at the station was at the risk of the shipper from the time of delivery at the point of consignment.' That would have been so if they had given notice to the consignee of the arrival of the goods, but to say that the goods are at the risk when he does not know that they are there, and when they have neglected to give him any notice that they are there, is to say what I cannot agree to be the law.

If notified, of course it was his duty to be there to receive the goods promptly and to take them away. If not notified, it was not his duty to be there, and the company would not be justified in putting the goods out in a storm, where they would be exposed to the weather if they were perishable or of a nature to be injured by the storm. Do not forget that one of the points of inquiry is whether the goods were put out in the storm or not, because that is very material. That is alleged on one side and denied on the other. It is a question of fact which you are to find. I am only dealing now with the law upon a supposed state of facts. The application of the law to the facts is for you. If the goods were not put out in the storm, or if the plaintiff knew they were at the station or had reason to know that they were there, it was his duty to be on the alert to receive them and to protect his property. If, on the other hand, he had no reason to believe that and had no notice from the company and if they put the goods out in the storm and they were injured, then they are liable for the loss."

(5) Refusal to affirm defendant's second point, and the answer thereto, as follows:

" Then I am asked to instruct you that 'It was, under all the evidence in the case, the duty of the consignee to be on the lookout for his property and ready to receive it on its arrival at the point of destination.' I repeat what I have said upon that subject. Yes, if he was notified of its arrival, or if he knew of its arrival, or, I will say, if he knew when it would arrive. But, plainly, he could not be accused of negligence if he had no information or knowledge upon the subject of the arrival of the goods at all."

(6) Refusal to affirm defendant's third point, and the answer thereto, as follows:

" The third point submitted to me is, that 'It appears from the evidence that Strafford was at the time a prepaid station at which there was no freight station, and that it was the custom of the company not to give notice to the consignee of the arrival of goods.' If that was the custom, it was a very bad custom indeed, and one which was contrary to law, and the sooner it is abolished the better, because it is the plain duty of every carrier, when goods reach their final destination, to give notice to the consignee of their arrival. Whether they were in

the habit of doing so or not makes no difference as regards the rights of the party whose property has been injured by their negligence."

(7) Refusal to affirm defendant's fourth point, which point was as follows :

" The evidence shows that the consignee did not use due diligence in protecting the goods by taking them to the house as soon as they arrived, and he cannot charge the loss caused by this neglect upon his part."

(8) Refusal to affirm defendant's fifth point, which point was as follows :

"Under all the evidence in the case the verdict of the jury must be for the defendant."

*Geo. Tucker Bispham*, with him *John Hampton Barnes*, for appellant.—The learned judge charged broadly, and so held in his opinion upon a rule for a new trial, that it is in *all* cases incumbent upon a carrier to give notice to a consignee of the arrival of his goods. There has been, and is, a conflict in the decisions in this country upon this point. No case in Pennsylvania supports the proposition of the trial judge. There are cases elsewhere which do assert such a proposition, but none of these cases hold that a contract may not be made discharging the carrier from that duty.

If, however, the court should be of the opinion, as decided in the recent case of L. E. & W. Railroad Co. v. Hatch (Supreme Court of Ohio, March 10, 1893), 39 Northeast Rep. 1042, that " in the absence of both contract and statute to the contrary, sound policy and the present course of business require that the carrier should give notice to the consignee of the arrival of his goods, and that the consignee is entitled to a reasonable time during business hours, after receipt of notice, to remove the goods," then the critical question in this case is reached, namely :

May a carrier make a contract with the shipper to carry his goods to a point on its line of railway and put them off at that point without notice to the consignee or storage in a warehouse?

It is respectfully submitted that this proposition is sound in law and policy, and well supported by authority, as follows : Hutchinson on Carriers, section 376, and cases therein cited,

as follows: McMasters v. R. R., 69 Pa. 374; R. R. v. Wood, 9 A. & E. R. R. Cases, 424. This contract, it is submitted, is not against any public policy, nor is it a contract attempting to discharge the carrier from any negligence in the performance of its duty: Buck v. R. R. Co., 150 Pa. 170.

*Alfred J. Wilkinson*, for appellee.—Goods cannot be thrown down in a station house, or on a platform, at their destination, in the name and nature of a delivery—the responsibility of a carrier lasts until some other responsibility begins, and if one who has received goods as a carrier sets up the less responsibility of a warehouseman, he must show affirmatively that the first named and greater responsibility has given place to the less onerous one—which fact is to be shown by some delivery or tender, or notice of, or storage at the owner's risk: Chicago & R. I. R. R. v. Warren, 16 Ill. 505; Steamship Sultana v. Chapman, 5 Wis. 455; Milwaukee v. Fairchild, 6 Wis. 397.

The law is well settled that a carrier is bound to give notice to the consignee of the arrival of goods: Cope v. Cordova, 1 Rawle, 210; Hemphill v. Chenie, 6 W. & S. 62; Tanner v. Oil Company, 53 Pa. 411; Angell on Carriers, 5th ed. 1877, sections 313–315. He is bound to the exercise of great care by the nature of his undertaking. He must not be negligent. It is against public policy that he should be. It is also a violation of his contract, which is to carry safely. A stipulation that is intended to protect him in the violation of his contract as a carrier and in disregarding a settled rule of public policy, will not be sustained. The cases in which this doctrine is recognized and applied in this state are very numerous, citing Beckman v. Shouse, 5 R. 179; Bingham v. Rogers, 6 W. & S. 495; Laing v. Colder, 8 Pa. 479; Goldey v. Railroad Company, 30 Pa. 242; Powell v. Railroad Company, 32 Pa. 414; American Express Company v. Sands, 55 Pa. 140; Railroad Company v. Miller, 87 Pa. 395; Grogan v. Adams Express Company, 114 Pa. 523; Pennsylvania Railroad Company v. Raiordon, 119 Pa. 577; Western Union Telegraph Company v. Stevenson, 128 Pa. 442; Phœnix Pot Works v. Railroad Company, 139 Pa. 284; Buck v. Pennsylvania Railroad Company, 150 Pa. 171.

OPINION BY SMITH, J., January 18, 1897:

The plaintiff's claim grows out of the alleged failure of the

defendant, a carrier, to perform its duty in the transportation and delivery of goods shipped over its railroad. The evidence shows, without contradiction, that the goods were shipped by the plaintiff, in good condition, at Bethlehem, Pa., addressed to Samuel R. Riley, Strafford, Pa.; one shipment, consisting of "jack-rafters" and moldings, having been made in October, 1893, and another, of doors and moldings, in February, 1894. When received by the consignee, a large number of the jack-rafters were broken or otherwise injured, and the doors were entirely spoiled by exposure to the rain.

The defense, as set forth in the points submitted by the defendant on trial, was "that Strafford was at the time a prepaid station at which there was no freight station, and that it was the custom of the company not to give notice to the consignee of the arrival of goods;" that by the terms of the bills of lading, or shipping receipts, "the shipment at the station was at the risk of the shipper from the time of delivery at the point of consignment," that "it was the duty of the consignee to be on the lookout for his property and ready to receive it on its arrival at the point of destination;" and that the damage to the goods was due to the consignee's neglect to be at the station on their arrival, to receive and protect them from injury.

Altogether, ten shipments appear to have been made by the plaintiff to the consignee. As to eight of these, in which the goods were uninjured, it does not appear whether notice of their arrival was given to the consignee, or whether the latter was at the station to receive them. As to the damaged goods, no notice appears to have been given; but the consignee's superintendent, on the first occasion, and his foreman, on the last, arrived at the station and saw the goods, a short time after they were unloaded. The damage, however, had already been done.

The injury to the jack-rafters appears to have happened in the course of transportation, or in unloading. There is no evidence that it was due to the consignee's failure to be at the station to receive them, or that the injury happened after they were unloaded. The only testimony on this subject is that the consignee's superintendent found them unloaded, many of them in a damaged condition, partly on the station platform and partly on the ground. The carrier gave no explanation of the injury, and offered no testimony as to their condition when

unloaded. Hence, even if its liability was limited by the custom alleged, or by the terms of the shipping receipt, the presumption of its negligence follows of course: Express Co. v. Sands, 55 Pa. 140. As to this shipment, the question of the carrier's duty to give notice to the consignee does not arise, since there is no evidence that the injury was due to the want of such notice.

The carrier's liability on the shipment of February, 1894, remains to be considered. In relation to this, the question is whether, if the carrier was required by law to give notice to the consignee, it was relieved of this duty by reason of the custom alleged, and whether, under the stipulations of the shipping receipt, it discharged its whole duty by the delivery which it made.

First, as to the custom alleged. The rule in this state as to relief from the carrier's liability at common law, by special custom or usage, is thus stated in McMasters v. R. R. Co., 69 Pa. 374 : " In all cases where this is relied on, the custom or usage must be clearly proved, and that the employer knew it, or is presumed to know it by reason of its generality in the neighborhood." The only testimony as to the alleged custom, and a general knowledge of it, in the present case, was that of Howell, the carrier's freight claim agent and of McFadden, its freight conductor. The testimony of Howell is as follows:

" Q. Was or was not the custom, and had it been the custom of the Pennsylvania Railroad Company to give notice to the consignees of the arrival of freight at such stations as this? A. It was not the custom. It never is done. Q. Is that a general custom? A. So far as my knowledge goes it is a universal custom with all the railroads in the country not to give notice of the arrival of freight at prepaid stations. Q. That is not only to this defendant, but to all other railroad companies, is it not? A. I believe it to be a general rule."

The testimony of McFadden is as follows:

" Q. On other occasions has anybody been at the station representing Mr. Riley to receive the freight? A. Yes, sir. There are parties there every morning receiving freight waiting for us to unload it. Q. You are positive in these other shipments shown in these waybills there were representatives there of Mr. Riley to whom you delivered the freight? A. Yes, sir.

Q. Anybody with wagons? A. Nobody there at all on this morning. Q. On the other mornings was there somebody there to haul that away? A. Not these shipments of lumber there was not. But there is a grocery store there; the party is there every morning to receive his freight when we come there. That is about the only party who would come to receive the freight would be waiting for us. Q. You say a party came to receive the freight; who was it? A. Some grocer that receives freight there. Q. Who came from Mr. Riley that you know to get his freight? A. I never saw anybody there. Q. Do you mean on any other occasion or on this occasion alone? A. None at all."

Thus the testimony of Howell is altogether indefinite as to the extent of his knowledge on the subject, and he is silent as to general knowledge of the alleged custom at Strafford. Mc-Fadden says nothing of a custom, and the only part of his testimony indicating any knowledge of the alleged custom at Strafford is his statement that a grocer at that point " was about the only party who would come to receive the freight, would be waiting for us."

This testimony falls far short of establishing the requisites of a custom by which a common law liability may be modified. There is by no means the clear proof of the custom or usage, and of the consignee's knowledge of it, or the presumption of his knowledge " by reason of its generality in the neighborhood where it is claimed to exist," which were declared essential in McMasters v. R. R. Co., 69 Pa. 374. The utmost effect that can be given to it is as showing that the railroad company has a rule, for the government of its freight conductors and agents, prescribing the method of disposing of freight at " prepaid stations," wholly irrespective of acquiescence, or even knowledge of the rule, on the part of the consignees, or of the community generally at those stations. Under this rule, moreover, the conductor, as he testified, would not have unloaded the freight in the present case had it been raining when his train reached the station. Thus the rule recognizes a duty to protect the freight at such stations, without requiring the consignee to look after it on its arrival. So far therefore, as the defense rests on a custom, it lacks the requisite foundation of proof, and, indeed, is not adequately stated in the point submitted.

Next, as to the stipulation limiting the carrier's liability.

The thirteenth clause of the conditions indorsed on the shipping receipt stipulates that "When merchandise is destined to or from the several 'way stations' and platforms, where station buildings have not been established by the carrier, or where there are no regularly appointed freight agents, it shall be at the risk of the owner until loaded into the cars and when unloaded therefrom."

In considering the effect that should be given to a custom or to a stipulation in a bill of lading or shipping receipt, in limitation of the carrier's common law liability, we must take into account the situation of the parties. This is very forcibly presented by Mr. Justice WILLIAMS, in Willock v. R. R. Co., 166 Pa. 184, viz: "The carrier and the shipper do not stand on equal terms. The latter cannot afford to refuse that which the carrier demands as a condition to the transportation of his goods, and, in ninety-nine cases out of every hundred, if he does so refuse he will find himself discriminated against until his business is ruined and he has nothing left to ship. The rule that stipulations, insisted on by carriers or other persons who stand in such a position toward their customers as enables them to compel a compliance with their demands or destroy their customer's business, should be judged of by their fairness, and held to be void whenever they are unreasonable or oppressive, is one of very large acceptance. Public policy compels its acceptance in all civilized countries."

This principle applies alike to a custom and to a stipulation, for, when demanded, as a condition to transportation, acquiescence cannot be refused in the one more than in the other. Transportation is an absolute necessity of business, with respect to which, in a large measure, the shipper has practically no freedom of choice, while the carrier may dictate terms unless restrained by legal obligation, competition, or enlightened self-interest. We cannot leave out of view the power and too often the disposition of the carrier, unless so restricted, to establish and enforce, with arbitrary hand, an unreasonable and oppressive practice in avoidance of his common law liability, declare it a custom, and demand acquiescence in it as such; or to limit his liability by conditions in a shipping receipt, reducing his obligations to a minimum, and imposed on the shipper nolens

volens. The contract, so called, implied from such conditions, is practically a dictation of terms by the carrier, to be declined by the shipper at his peril, and affording him only a choice of evils. Whether the shipper may refuse acquiescence, and demand transportation of his goods under the common law obligation of the carrier, we need not now decide, since, in the present case, the shipper accepted the receipt tendered, and gave it in evidence to prove delivery of the goods to the carrier. The question before us is to what extent the liability of the carrier is limited by the custom and the condition here set up as a defense.

Public policy forbids that any stipulation or condition shall release the carrier from liability for negligence: Willock v. R. R. Co., 166 Pa. 184. Even a provision fixing the value of the property, or limiting the amount to be recovered, will not relieve the carrier if the loss or injury be due to his negligence: Grogan v. Express Co., 114 Pa. 523; Weiller v. R. R. Co., 134 Pa. 310. The reasons for denying effect to such a stipulation or condition apply with equal force to a custom limiting in like manner the carrier's obligations. One of the first requisites of a custom in derogation of the common law is that it be not unreasonable. The policy of the stipulation and the reasonableness of the custom under consideration are to be tested by the same standard. If a stipulation or a condition be against public policy, assuredly a custom to the same effect must be pronounced unreasonable. Neither contract nor custom, therefore, can relieve a carrier from liability for negligence.

When goods have been carried to the place of destination, liability as carrier ceases, and the less onerous liability of a warehouseman is substituted: McCarty v. R. R. Co., 30 Pa. 247; Shenk v. Propeller Co., 60 Pa. 109. This liability is only for negligence: Ibid. We have therefore to consider whether the injury to the doors shipped by the plaintiff in February, 1894, was due to the carrier's negligence in the manner of keeping them after they had reached their destination. We need not here define the precise degree of care demanded in cases of this nature; it is sufficient for the present purpose to hold the carrier, as a warehouseman, to the lowest degree which the law will tolerate in a bailee. Its liability is at least that of a depositary, and this is liability for the want of ordinary care: Bank

v. Smith, 62 Pa. 47. Such care depends largely on the nature and value of the property; a degree of care which seems to have been required for the preservation of the shipment in this case would be unnecessary in a shipment of pig iron.

Strafford was among the "way stations" mentioned in the condition indorsed on the shipping receipt, without station buildings or freight agent. The only convenience for receiving freight was a small platform. The carrier neither provided shelter for the goods nor took other steps to protect them from the weather. The plaintiff's witnesses testified that it had been raining for some time when the doors were unloaded, while the defendant's freight conductor testified that the rain did not begin until about an hour after the unloading; and this is the only contradiction in the testimony. It is not denied that the doors were ruined by the rain, and the plaintiff's foreman testified that the ruin was complete upon his first knowledge that they were at the station.

Had the carrier taken any measure for the protection of the goods at their place of destination, the question of its sufficiency, under the circumstances, would have arisen. But it did nothing whatever; there was an absolute want of care in any degree. For a carrier to discharge freight without any attempt at making reasonable provision for its protection from dangers which, in the ordinary course of affairs, may naturally be apprehended, must be regarded as not only negligence but gross negligence. If a carrier may do this at one station, he may with equal right do it at all stations, and thus be relieved from his obligation as a warehouseman throughout his entire route, for it is impossible to fix the point between a crossroad station and a large city at which this obligation is to begin or end. He may even dispense with a platform on which to unload freight, and "just chuck it off," as one of the defendant's agents testified was sometimes done. The carrier's duty at a station is not to be measured by the quantity of freight received; as to this, no line can be drawn fixing the point at which the duty of ordinary care begins. This duty is not discharged at any station, by dropping freight at the side of the road, whether on an open platform or in mud or snow, to remain exposed to the elements, to injury from other sources, or to theft, until the owner learns of its arrival and removes it. To give to such a practice

the legal sanction of a custom, or to enforce a stipulation permitting it, would be to place the public at the mercy of the carrier. In this case, the defendant's freight conductor testified : "If it had been storming when I came to Strafford I would not have unloaded those doors." But between unloading freight in a storm, and leaving it, after unloading, where a storm may ruin it before the owner can take care of it, the difference in negligence is only one of degree. Upon the principle laid down in Willock v. R. R. Co., supra, that "stipulations, insisted on by carriers or other persons who stand in such a position toward their customers as enables them to compel a compliance with their demands or destroy their customer's business, should be judged of by their fairness, and held to be void whenever they are unreasonable or oppressive," the stipulation in the shipping receipt must be pronounced void, so far as it is urged in justification of the practice pursued by the carrier at the point of destination. In this aspect, it is in the highest degree unfair, unreasonable, and oppressive. What effect might justly be given to such a stipulation, expressly made by a shipper not coerced by his business situation or necessities, but with actual freedom of choice, and for a consideration, we need not now consider.

In this view of the case, it is not material whether or not the carrier is by law required to give the consignee notice of the arrival of freight. Neither freedom from such obligation, nor its performance, can relieve the carrier from the duty of ordinary care at the place of destination. If notice is unnecessary, the need of care is all the greater. A failure on this point is negligence, from the consequences of which neither notice, custom nor stipulation can relieve the carrier. Therefore the language of the trial judge in relation to the duty of giving notice did the defendant no harm.

We do not regard this view of the questions involved as conflicting in any manner with the point actually decided in Mc-Masters v. R. R. Co., 69 Pa. 374. In that case, no question of negligence on the part of the carrier was raised, suggested or considered, except such as might be implied from a failure to deliver the goods. The case turned solely on the question of actual delivery at the station ; the defendant contending that

the goods had been delivered there, while this was denied by the plaintiff.

The specifications of error are overruled, and the judgment is affirmed.

DISSENTING OPINION BY BEAVER, J., January 18, 1897 :

Established precedent founded in reason and upon authority which I regard as binding compels me to dissent from the conclusion reached by the majority of the court in this case.   Recovery was had in the court below upon one or both of two distinct grounds : First. That the defendant, a common carrier by rail, unloaded from its cars upon its platform the merchandise of the plaintiff, carried by it, in such a negligent way as to destroy its value for the purposes for which it was intended, the negligence consisting as to one consignment in the breakage of a part of the merchandise and in another consignment in the unloading of doors and other material intended for the inside work of a house, in the midst of a rain storm, in consequence of which the material was rendered practically worthless.   As to this point there was contradictory testimony, it being contended, on the one hand, so far as the last and principal consignment is concerned, that the storm had not begun, when the goods were unloaded, and on the other hand, that it was raging at the time the train arrived at the station and the goods were unloaded. The question involved in this part of the case was we think fairly submitted to the jury, and, in view of the contradictory character of the testimony, the answers of the trial judge to the defendant's fourth and fifth points, as contained in the 7th and 8th assignments of error, I agree must be sustained and these assignments overruled.   Whether, however, the verdict was based upon the finding of the jury as to this particular fact or as to another question which arose in the case, it is impossible to determine, and I am, therefore, compelled to consider at length a second question which legitimately grows out of the facts in the case and concerning which the trial judge in the court below made a distinct and positive ruling which has been assigned as error.   It is a question concerning which there has been great contrariety of opinion and decision in the courts of last resort of the several states, and upon which our text writers upon the subject are almost equally divided.   The question, as it is raised

in this case, is capable of subdivision into three distinct propositions, and first, the general proposition : Is a common carrier by rail bound to notify a consignee of the arrival of goods at the carrier's station ?   Second: If there be such a duty on the part of the carrier, can it be modified or avoided by a stipulation in its bill of lading ?   And Third : Can the carrier set up a general custom or a particular custom as to a special class of stations, at which there was no warehouse and no freight or station agents, which will relieve him of the duty of giving notice of the arrival of goods to the consignee ?   These three questions practically cover all the remaining alleged errors, as contained in the appellant's first, second, third, fourth, fifth and sixth assignments.   They will be considered in the order above named :

First, as to the general proposition.   As already intimated, there is a very wide divergence of view on the part of our courts of last resort, both in England and in this country, but with this divergence, so far as the consideration of the case under review is concerned, it is not necessary to occupy space in discussion, except to say that, so far as Pennsylvania is concerned, no case has arisen which required a distinct ruling on the subject.   The different views as to the question, however, are presented in dicta of Mr. Justice SHARSWOOD in Shenk v. Philadelphia Steam Propeller Co., 60 Pa. 109 (1869), and Mr. Justice READ in Tanner v. Oil Creek R. R., 53 Pa. 411 (1866).

Admitting, however, that the law is not clearly settled in Pennsylvania, can a shipper by express stipulation waive the right to notice and discharge the common carrier from liability as such, when the goods are delivered upon the platform of the carrier at a station where there is no warehouse and where he cannot in the nature of things undertake the duties of warehouseman ?   If, for the convenience of a consignee, a common carrier by rail agrees to deliver at a road crossing upon a private turnout or a private platform any goods which may be forwarded at any time to the said consignee, in consideration of a release at and after the time of such delivery of all liability as a common carrier, it can hardly be doubted that such an agreement would be held to be binding.   This would be equally true, if a dozen neighbors in the vicinity of the crossing united in asking that their goods should be so delivered.   Why is it not equally true, if the common carrier, for the benefit of a

small community where the business does not justify the erection of a warehouse and the employment of a station agent, erects for the convenience of people in the neighborhood a platform, with the general understanding as to all who will have freight addressed to that station that the duties of the carrier cease as such, when the goods are delivered upon the platform? And, if this proposition be true, why may not a consignor, with the knowledge that a station is what is called a "prepaid" station, ship goods to that point, stipulating that the duties of the common carrier shall cease as such, when delivery is made upon the platform of such a station? If this proposition be tenable, we cannot see why the 5th condition in the bill of lading of the Central Railroad Co. of New Jersey, of October 7, 1893, and the 13th condition of the bill of lading of the Easton & Amboy Railroad Company of February 22, 1894, shall not be binding upon the consignor. They constitute the contract between shipper and carrier. Such a contract does not contravene established law. It is not contrary to public policy. It is the subject of agreement. It does not release the carrier from negligence or from any liability as a common carrier. It is simply an agreement to terminate the relation existing between the consignor and the carrier upon the delivery of the goods carried, upon the platform of the carrier at the place of final destination. It is perhaps fair to say that there is no express waiver of notice to consignee either in the 5th paragraph of the bill of lading of the Central Railroad Company of New Jersey, or in that of the Easton & Amboy Railroad Company of February 22, 1894. In the latter, under which the main consignment for which recovery was had was shipped, there occurs this clause : "Except that, when merchandise is destined to or from the several way stations and platforms where station buildings have not been established by the carrier, or where there are no regularly appointed freight agents, it shall be at the risk of the owner, until loaded into the cars and when unloaded therefrom." The court below having correctly charged the jury that the defendant was entitled to the benefit of the contract made by the consignor with the connecting railroads, upon which the goods had been shipped, this stipulation must, of course, be held as inuring to the benefit of the defendant. I am of opinion, therefore, that the court below should have affirmed the defendant's first point in toto,

so far at least as the consignment last above referred to was concerned.

As to the third proposition, assuming that there is no general rule of law which forbids, why was it not competent for the defendant in the court below to show a general custom known and understood in the community and known by the consignee of the goods carried, that the consignees of goods delivered at Strafford station were expected to remove the same upon their arrival without notice?  And, if shown, why should the jury not have been instructed that, if they found that as a fact, the plaintiff could not recover on the ground of lack of notice? As I understand McMasters v. Penna. R. R., 69 Pa. 374, this question was therein expressly decided.   Chief Justice THOMP-SON, after describing the station at Turtle Creek and the particular circumstances attending the shipment and delivery of the barrel of sugar which was involved in the case, says : " The defendants had no warehouse at that place and gave no notice to the consignee that the sugar had been delivered at that place, but insisted that it was the custom for consignees to be present themselves, or by somebody for them, to receive goods shipped for them by rail to that place.   This custom was testified to by the plaintiff himself and also by the conductor of the local freight train and the proof was not at all controverted.   Was this uncontroverted custom sufficient excuse for the want of warehousing and of notice to the consignee by defendants ? The learned judge thought it was, and so instructed the jury, and there was a verdict for the defendants.   In other words he held a delivery on the platform a good delivery, under the custom.   That a custom or usage will control the general law of liability of carriers is shown by many cases.   I will quote briefly from a few of the decisions to that effect, as also from some of our most reliable text writers."   Then follow quotations from Redfield on Railways, Angell on Carriers and numerous cases decided in the courts of other states, closing with this language by Chief Justice THOMPSON : " This is a clear recognition of the power of custom to regulate the liability of common carriers, and I need not further multiply cases to prove a matter so consonant to reason as this.   The cases cited by the plaintiff in error are good law but relate to adjudications on the law of carriers without any reference to the question here,

namely, how far it is within the usage and course of business to modify the duties and liabilities of common carriers? But in all cases where this is relied upon by the carrier the custom or usage must be clearly proved, and that the employer knew it or is presumed to know it by reason of its generality in the neighborhood where it is claimed to exist." In view of the general character of this decision and the reasoning upon which it is founded, I am led to the irresistible conclusion that the trial judge in the court below was in error, both in the general charge and in the answer to defendant's second and third points, when he laid down the general proposition that a common carrier is bound under all circumstances, to give notice to the consignee of the arrival of goods, and particularly in the answer to the defendant's third point, which point and the answer thereto are as follows : " 'It appears from the evidence that Strafford was at the time a prepaid station at which there was no freight station, and that it was the custom of the company not to give notice to the consignee of the arrival of goods.' If that was the custom, it was a very bad custom indeed and one which was contrary to law and the sooner it is abolished the better, because it is the plain duty of every carrier, when goods reach their final destination, to give notice to the consignee of their arrival. Whether they were in the habit of doing so at once made no difference as regards the rights of the party whose property has been injured by their negligence." Mr. Angell, in his treatise on the law of carriers, lays down the general proposition, in section 315, as cited by the appellee, that "The carrier is, of course, bound to continue his care of the goods, until a knowledge of the notice is brought home to the owner or consignee;" but in the next section (316), he says, "But the carrier may be permitted to prove that the uniform usage and course of business in which he is engaged is to leave the goods at his usual stopping place in the town to which they are directed, without notice; and if such usage has been of so long continuance as to justify a jury to find that it was known to the employer, the carrier will be discharged."

As to the general proposition herein referred to, I do not think it necessary in this case to decide whether or not a common carrier by rail is bound under the law, as it is held in Pennsylvania, to notify a consignee of the arrival of goods at the carrier's sta-

tion, but I would hold that, even if there be such a duty generally, it can be modified or avoided by an express stipulation in the bill of lading, the acceptance of which will be a practical waiver by the consignor, and that the carrier can set up a general custom.or a particular custom as to a special class of stations at which there was no warehouse and no freight or station agent which will, if the evidence justify such a finding by a jury, relieve him of the duty of giving notice of the arrival of goods to the consignee, and I would base this decision expressly upon the case of McMasters v. The Pennsylvania Railroad, supra, from which I am unable to distinguish the present case, so far as the effect of an established custom in relieving the carrier from the necessity of notice of the arrival of goods to the consignee is concerned.

In this dissent RICE, P. J., and WILLARD, J., unite.